# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #027

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **26th day of June, 2019**, are as follows:

**PER CURIAM**:

2012-KA-0508        STATE OF LOUISIANA  v. JEFFREY CLARK (Parish of West Feliciana)
The United States Supreme Court granted certiorari to remand for further consideration in light of McCoy v. Louisiana, 584 U.S. —, 138 S.Ct. 1500, — L.Ed.2d — (2018). With the benefit of additional briefing and oral argument, and after further consideration, we again affirm appellant's conviction and sentence.

AFFIRMED.

Retired Judge Hillary Crain appointed Justice ad hoc, sitting for Justice Crichton, recused.

## SUPREME COURT OF LOUISIANA

## No. 2012-KA-0508

## STATE OF LOUISIANA

## VERSUS

## JEFFREY CLARK

## ON REMAND FROM THE UNITED STATES SUPREME COURT

**PER CURIAM**[*]

After his second trial, appellant Jeffrey Clark was found guilty of the first degree murder of Captain David Knapps, which was committed on December 28, 1999, during a failed attempt to escape from the Louisiana State Penitentiary at Angola, where appellant was serving a life sentence for first degree murder.[1] Appellant's first trial ended in a mistrial after opening statements in the guilt phase because the prosecution informed the jury that appellant was already serving a life sentence.[2] Following his second trial, appellant was found guilty of first degree murder and sentenced to death. Appellant's conviction and sentence were affirmed on appeal.[3]

The United States Supreme Court granted certiorari to remand for further consideration in light of *McCoy v. Louisiana*, 584 U.S. —, 138 S.Ct. 1500, —

---

[*] Retired Judge Hillary Crain appointed as Justice ad hoc, sitting for Crichton, J., recused.

[1] *State v. Clark*, 492 So.2d 862 (La. 1986) (affirming appellant's conviction for the first degree murder of Andrew Cheswick but vacating the sentence of death).

[2] *State v. Clark*, 10-1676 (La. 7/17/10), 39 So.3d 594.

[3] *State v. Clark*, 12-0508 (La. 12/19/16), 220 So.3d 583.

L.Ed.2d — (2018).[4] With the benefit of additional briefing and oral argument, and after further consideration, we again affirm appellant's conviction and sentence for the reasons that follow, in addition to the reasons stated previously in *State v. Clark*, 12-0508 (La. 12/19/16), 220 So.3d 583.

In *McCoy v. Louisiana*, 584 U.S. —, 138 S.Ct. 1500, — L.Ed.2d — (2018), the United States Supreme Court determined that the violation of the defendant's Sixth Amendment-secured autonomy was a structural error that is not subject to harmless-error review. Thus, the Supreme Court found that this court had erred in affirming McCoy's three first degree murder convictions and death sentences because the trial court did not permit McCoy to replace his retained counsel on the eve of trial, and McCoy's trial counsel conceded that McCoy murdered his victims despite the fact that McCoy "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *Id.*, 138 S.Ct. at 1505. In determining that a structural error had occurred in *McCoy*, the Supreme Court explained:

> The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence." At common law, self-representation was the norm. See *Faretta v. California,* 422 U.S. 806, 823, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (citing 1 F. Pollock & F. Maitland, The History of English Law 211 (2d ed. 1909)). As the laws of England and the American Colonies developed, providing for a right to counsel in criminal cases, self-representation remained common and the right to proceed without counsel was recognized. *Faretta,* 422 U.S., at 824–828, 95 S.Ct. 2525. Even now, when most defendants choose to be represented by counsel, see, *e.g.,* Goldschmidt & Stemen, Patterns and Trends in Federal *Pro Se* Defense, 1996–2011: An Exploratory Study, 8 Fed. Cts. L. Rev. 81, 91 (2015) (0.2% of federal felony defendants proceeded *pro se* ), an accused may insist upon representing herself—however counterproductive that course may be, see *Faretta,* 422 U.S., at 834, 95 S.Ct. 2525. As this Court explained, "[t]he right to defend is personal," and a defendant's choice in exercising that right "must be honored out of 'that respect for the individual which is the lifeblood of the law.' " *Ibid.* (quoting *Illinois v. Allen,* 397 U.S. 337, 350–351, 90

---

[4] *Clark v. Louisiana*, 138 S. Ct. 2671, 201 L.Ed.2d 1066 (2018) (Mem).

S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)); see *McKaskle v. Wiggins,* 465 U.S. 168, 176–177, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("The right to appear *pro se* exists to affirm the dignity and autonomy of the accused.").

The choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel. For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta,* 422 U.S., at 819–820, 95 S.Ct. 2525; see *Gannett Co. v. DePasquale,* 443 U.S. 368, 382, n. 10, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense"). Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez v. U.S.,* 553 U.S. 242, 248, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008) (internal quotation marks and citations omitted). Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. See *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are.* See *Weaver v. Massachusetts,* 582 U.S. ——, ——, 137 S.Ct. 1899, 1908, 198 L.Ed.2d 420 (2017) (self-representation will often increase the likelihood of an unfavorable outcome but "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty"); *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.,* 528 U.S. 152, 165, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (Scalia, J., concurring in judgment) ("Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State.").

*McCoy*, 138 S.Ct. at 1507–1508 (emphasis in original).

The Supreme Court in *McCoy* recognized that a capital defendant might not share in his counsel's objective of avoiding the death penalty; instead, an accused may prefer not to admit that he killed family members, as in McCoy's case, or may

3

"hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration." *Id.*, 138 S.Ct. at 1508 (citations omitted). Thus, "[w]hen a client expressly asserts that the objective of '*his* defense' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Id.*, 138 S.Ct. at 1509 (emphasis in original) (citations omitted). Still, the Supreme Court observed, "Trial management is the lawyer's province: Counsel provides his or her assistance by making such decisions as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" *Id.*, 138 S.Ct. at 1508 (*quoting Gonzalez v. United States*, 553 U.S. 242, 248, 128 S.Ct. 1765, 1769, 170 L.Ed.2d 616 (2008)).

The Supreme Court distinguished the situation presented in *McCoy* from those presented in *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) and *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). In the former case, Nixon's autonomy was not overridden by his counsel because Nixon "was generally unresponsive" throughout discussions regarding trial strategy, during which counsel made clear the intention to concede guilt. *McCoy*, 138 S.Ct. at 1509 (citation omitted). In contrast, the Supreme Court observed that McCoy "opposed [counsel's] assertion of his guilt at every opportunity, before and after trial, both in conference with his lawyer and in open court." *Ibid.* Therefore, "[p]resented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way." *Ibid.* (citations omitted). With respect to the latter case, the Supreme Court found that the difference between *McCoy* and *Nix* was that Whiteside informed his counsel that he intended to commit perjury, and McCoy had not. *Id.*, 138 S.Ct. at 1510 (observing that McCoy's counsel "harbored no doubt that McCoy believed what he was saying"

4

with respect to his alibi). Instead, counsel's "express motivation for conceding guilt was not to avoid suborning perjury, but to try to build credibility with the jury, and thus obtain a sentence lesser than death." *Ibid.*

Based on the foregoing, the Supreme Court found that "counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." *Ibid.* In addressing the dissent and comparing this court's affirmance in *McCoy* to decisions in other jurisdictions, the Supreme Court observed:

> [H]ere, the defendant repeatedly and adamantly insisted on maintaining his factual innocence despite counsel's preferred course: concession of the defendant's commission of criminal acts and pursuit of diminished capacity, mental illness, or lack of premeditation defenses. . . . These were not strategic disputes about whether to concede an element of a charged offense . . . ; they were intractable disagreements about the fundamental objective of the defendant's representation.

*Ibid.* (citations omitted). The Supreme Court concluded:

> [Defense counsel] was placed in a difficult position; he had an unruly client and faced a strong government case. He reasonably thought the objective of his representation should be avoidance of the death penalty. But McCoy insistently maintained: "I did not murder my family." App. 506. Once he communicated that to court and counsel, strenuously objecting to English's proposed strategy, a concession of guilt should have been off the table. The trial court's allowance of English's admission of McCoy's guilt despite McCoy's insistent objections was incompatible with the Sixth Amendment. Because the error was structural, a new trial is the required corrective.

*McCoy*, 138 S.Ct. at 1512.

In his petition for certiorari, appellant Clark framed the issue as "Whether the Louisiana Supreme Court's rule—that an indigent defendant must accept his trial counsel's decision to concede his guilt of second degree murder over his express objections or represent himself—vitiates the voluntariness of petitioner's waiver of counsel?" Pet. at i. In his brief following remand, appellant contended

5

that his *Faretta*[5] waiver was "unknowing, unintelligent and as such involuntary because it was predicated on the incorrect instruction that his choice was to represent himself or have his counsel admit his guilt of some of the elements of the offense." Supp. Br. at 8. Thus, appellant claimed he was forced to choose between "structurally deficient counsel or none at all." *Id*. at 9. Appellant concluded that "[t]he trial court's *McCoy* error denied [him] both . . . the right to counsel and the right to be fully and correctly informed concerning the rights he was waiving." *Id*. at 10. These contentions can only be evaluated after examining the context in which the waiver occurred in some detail.

Before his first trial, appellant at various times sought to remove appointed counsel, asserted his right to self-representation, was permitted a hybrid representation (in which he both represented himself and had the assistance of counsel), and withdrew his assertion of his right to self-representation. During those times, appellant indicated a desire to retain private counsel, complained about appointed counsel's workload and failure to communicate with him, contended his defenses were antagonistic with codefendants who had not yet been severed for trial, and indicated that if "forced to choose between having his court appointed attorneys or having direct access to the law library . . . [he] will invoke his right to self-representation." Pro se motion, R. Vol. 4 at 730. Ultimately, appellant withdrew his waiver before his first trial and permitted appointed counsel to make opening remarks, during which counsel conceded that appellant was involved in the attempt to escape but denied he participated in an intentional homicide. As noted above, appellant's first trial progressed no farther than opening remarks.

Just before the commencement of his second trial, appellant again asserted

---

[5] *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

his right to represent himself. The district court then held an extensive *Faretta* colloquy with appellant, which spans nearly 40 pages in the record and was described previously in *State v. Clark*, 12-0508, pp. 60–63 (La. 12/19/16), 220 So.3d 583, 636–639. Appellant requested, and was permitted, a hybrid representation in which he could choose the degree to which he or counsel participated in every aspect of trial.

The district court conducted an additional inquiry with appellant in chambers into whether there was a conflict between appellant and counsel over defense strategy.[6] Appellant described what he characterized as a "difference of opinion" with counsel. According to appellant, it was counsel's opinion that "the only way to save me from the death penalty, should I be convicted, is to convince the jury to trust him." For counsel to gain that trust would require, in appellant's view, "throwing me under the bus" by asking the jury to find appellant guilty of second degree murder so that he could receive a sentence of life imprisonment. Appellant, however, stated that he would prefer to be sentenced to death rather than life imprisonment because, among other reasons, he believed he would have better access to appellate resources to challenge his conviction thereafter, as long as he faced capital punishment. Appellant also expressed his belief that it was in his best interest to be the one "to present the truth" to the jury.

Additional discussion on the nature of the hybrid representation occurred the next day in chambers between the court, appellant, and defense counsel. After defense counsel expressed logistical concerns with serving as appellant's co-counsel (rather than standby counsel), and in particular that their strategies could conflict, appellant indicated that he was not yet certain what his strategy would be.

---

[6] The transcript of the proceedings conducted ex parte and in chambers was originally sealed, but later unsealed in response to an unopposed motion by the State. Material quoted within this paragraph come from pages 28–31 of this formerly sealed transcript.

7

Nonetheless, appellant reiterated that he did not want an admission to be made that could result in a life sentence. Appellant also indicated that he, as lead counsel, wished to make an opening statement and examine the witnesses (with the exception of any experts).

The district court acceded to appellant's wishes and recognized him as lead counsel. Once trial commenced, appellant made an opening statement, which drew heavily on counsel's opening statement from his first trial, in many parts almost verbatim. Appellant admitted that he was recruited at the last minute to assist in the attempt to escape but claimed he was assured that no one would be hurt in the attempt. Appellant also admitted he was present when Captain Knapps was attacked, although he claimed he tried to intervene on his behalf. Finally, it is also noteworthy what appellant told the jury about his decision to represent himself:

> The constitution gives myself and each and every other person in America who may be accused by the state a right to represent themselves. I've invoked that right because it's important to me that you ladies and gentlemen of the jury get an opportunity to gauge the type of person I am better than if I talk and look at you—I mean better if I talk and look at you, rather than if I just sit mute at defense counsel.

R. Vol. 44 at 8178.

After reviewing the record, we cannot agree with appellant that a structural error was imminent, that appellant was compelled to forego the assistance of counsel and represent himself to prevent one, or that appellant's decision was vitiated by the manner in which the district court conducted the *Faretta* colloquy. In our prior decision, we rejected appellant's claim that "his decision to represent himself during certain portions of his trial, while knowingly and intelligently made, was involuntary due to his 'attorneys' unilateral decision to concede [his] guilt of first degree murder over [his] objection.'" *State v. Clark*, 12-0508, p. 60 (La. 12/19/16), 220 So.3d 583, 636–637 (quoting from appellant's brief and finding that

8

"[t]he record shows that the factual basis of this argument is false"). We similarly find the factual basis for appellant's present arguments lacking.

Counsel did not concede appellant participated in a murder of any degree, and the record does not show that counsel had determined to do so. While appellant did express concern that counsel would "throw him under the bus" and make a concession that could result in a life sentence, appellant made other comments minimizing his disagreement with counsel, and indicating that appellant had not yet completely decided what his defense would be but that his strategy was converging with that of counsel. What is clear is that during opening remarks at appellant's first trial, counsel flatly denied that appellant was involved in the murder and denied that appellant had the requisite specific intent, which statements appellant echoed during his opening remarks at the second trial. The record here does not establish that counsel planned to concede defendant's guilt in a homicide over appellant's objection in an effort to save appellant's life.[7]

The record also does not establish that appellant was forced to make a choice between representation that would compromise his autonomy or no representation at all. The district court allowed appellant to choose a hybrid representation in which appellant decided the contours of his and his co-counsel's roles in every aspect of the trial. Appellant also offered several reasons for his choice that did not implicate any disagreement with counsel at all, such as his desire to better engage with the jury.

Finally, the record does not show that the district court misinformed

---

[7] Appellant, however, also suggests that counsel planned to admit appellant's guilt of "some of the elements" of the charged offense. Given the distinction drawn in *McCoy*, 138 S.Ct. at 1510, between "strategic disputes about whether to concede an element of a charged offense" and "intractable disagreements about the fundamental objective of the defendant's representation," it is not clear whether such a concession would necessarily constitute a structural error. Regardless, other than appellant's participation in the attempt to escape, which was also admitted by appellant at trial (and by appellate counsel when seeking review, Pet. at 5), those elements have not been identified by appellant.

9

appellant during the *Faretta* colloquy and associated discussions in chambers. We previously approved of this extensive *Faretta* colloquy in *State v. Clark*, 12-0508, pp. 62–63 (La. 12/19/16), 220 So.3d 583, 637–639, and the United States Supreme Court's decision in *McCoy v. Louisiana*, 584 U.S. —, 138 S.Ct. 1500, — L.Ed.2d — (2018), does not render it deficient even in hindsight.

The record shows that appellant and counsel were aligned in their strategy to deny involvement in the murder while admitting participation in the attempt to escape. While the nature of their disagreement is not clear, it is clear that this record does not reflect an intractable disagreement about the fundamental objective of the representation. Appellant offered several reasons for his decision to assume the mantle of lead counsel, and was thoroughly and correctly advised by the district court, before the court permitted him a hybrid representation. We find that there was no violation of appellant's Sixth Amendment-secured autonomy here comparable to that in *McCoy v. Louisiana*, 584 U.S. —, 138 S.Ct. 1500, — L.Ed.2d — (2018), nor was one implicated in his decision to represent himself with the assistance of qualified co-counsel. Therefore, for the reasons expressed here, and for the reasons expressed previously in *State v. Clark*, 12-0508 (La. 12/19/16), 220 So.3d 583, we affirm defendant's conviction and death sentence.

In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.R.S.

15:567(B), immediately notify the Louisiana Public Defender Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.R.S. 15:178; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.

**AFFIRMED**